Albert JOHNSON, Plaintiff–Appellant,

v.

Richard J. PHELAN, et al., Defendants–Appellees.

No. 93–3753.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 1, 1995.

Decided Oct. 24, 1995.

James C. Schroeder, David J. Franklyn (argued), Mayer, Brown & Platt, Chicago, IL, for Albert Johnson.

Michael David Jacobs (argued), Office of the State's Attorney of Cook County, Terry L. McDonald, Asst. State's Atty., Office of the State's Attorney of Cook County Federal Litigation Division, Chicago, IL, for Richard J. Phelan, Thomas J. Charnogorsky, Michael F. Sheahan, James W. Fairman, Jr., Raul Estrada.

Before POSNER, Chief Judge, and PELL and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

 Albert Johnson brought this suit under 42 U.S.C. § 1983. According to his complaint, which the district court dismissed for failure to state a claim on which relief may be granted, female guards at the Cook County Jail are assigned to monitor male prisoners' movements and can see men naked in their cells, the shower, and the toilet. Johnson sought damages from persons including the President of the Cook County Board and the Chairman of the County's Buildings and Zoning Commission. Most of the defendants have no relation to the events of which Johnson complains and were properly dismissed because § 1983 does not establish vicarious liability. See *Houston v. Sheahan*, 62 F.3d 902 (7th Cir.1995). The district court also properly rejected Johnson's argument that different monitoring patterns in different cellblocks within the Jail violate the equal protection clause of the fourteenth amendment. 1993 U.S.Dist. LEXIS 13681 (N.D.Ill.). Johnson has abandoned on appeal any contention that monitoring in the local courthouse lockup's bathroom violates the Constitution. But his argument that cross-sex monitoring in the Jail violates the due process clause requires additional discussion in light of *Canedy v. Boardman*, 16 F.3d 183 (7th Cir.1994), which holds that a right of privacy limits the ability of wardens to subject men to body searches by women, or the reverse. Our case involves visual rather than tactile inspections, and we must decide whether male prisoners are entitled to prevent female guards from watching them while undressed.

Observation is a form of search, and the initial question therefore is whether monitoring is "unreasonable" under the fourth amendment. So the Supreme Court conceived the issue in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), where a pretrial detainee argued that routine inspections of his body cavities violated the Constitution. (Johnson also was a pretrial detainee at the time of the events covered in his complaint, but in light of *Wolfish* he does not argue that detainees have rights exceeding those of prisoners following conviction.) The Court held that these searches are "reasonable" because they are prudent precautions against smuggling drugs and other contraband into prison. 441 U.S. at 558–60, 99 S.Ct. at 1884–85. Prisoners argued that metal detectors plus supervision of inmates' contacts with outsiders would be superior to body-cavity inspections. The Court replied that prisons need not adopt the best alternatives. 441 U.S. at 559–60 n. 40, 99 S.Ct. at 1884–85 n. 40. Less-restrictive-alternative arguments are too powerful: a prison always can do something, at some cost, to make prisons more habitable, but if courts assess and compare these costs and benefits then judges rather than wardens are the real prison administrators. *Wolfish* emphasized what is *the* animating theme of the Court's prison jurisprudence for the last 20 years: the requirement that judges respect hard choices made by prison administrators. E.g., *Sandin v. Conner*, — U.S. —, —––—, 115 S.Ct. 2293, 2299–2300, 132 L.Ed.2d 418 (1995); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349–50, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119,

125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 561–63, 94 S.Ct. 2963, 2977–78, 41 L.Ed.2d 935 (1974).

*Wolfish* assumed without deciding that prisoners retain some right of privacy under the fourth amendment. Five years later the Court held that they do not. *Hudson v. Palmer,* 468 U.S. 517, 526–30, 104 S.Ct. 3194, 3200–02, 82 L.Ed.2d 393 (1984), observes that privacy is the thing most surely extinguished by a judgment committing someone to prison. Guards take control of where and how prisoners live; they do not retain any right of seclusion or secrecy against their captors, who are entitled to watch and regulate every detail of daily life. After *Wolfish* and *Hudson* monitoring of naked prisoners is not only permissible—wardens are entitled to take precautions against drugs and weapons (which can be passed through the alimentary canal or hidden in the rectal cavity and collected from a toilet bowl)—but also sometimes mandatory. Inter-prisoner violence is endemic, so constant vigilance without regard to the state of the prisoners' dress is essential. Vigilance over showers, vigilance over cells—vigilance everywhere, which means that guards gaze upon naked inmates.

Johnson mentions the fourth amendment but ignores *Wolfish* and *Hudson.* His principal argument uses the due process clause; and because he does not seek a hearing, he is invoking principles of substantive due process. Yet courts should not reverse the outcome of a fourth amendment analysis in the name of substantive due process. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and *Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), hold that substantive due process is not an appropriate substitute for analysis under provisions of the Constitution that address a subject directly, and in particular does not trump the fourth amendment. "Privacy" has too many other connotations—from the right of reproductive autonomy that has nothing to do with searches and seizures to the common law right to control the publication of certain facts about oneself, including the depiction of one's naked body, see *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1229–30 (7th Cir.1993)—to be a useful substitute for the fourth amendment (or, as we discuss below, the eighth).

■ What is more, moving ground from the fourth amendment to the fifth would not help Johnson. Under the due process clause the question is whether the regulation is "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987). Surveillance of prisoners is essential, as *Wolfish* establishes. Observation of cells, showers, and toilets is less intrusive than the body-cavity inspections *Wolfish* held permissible. Guards do the surveillance. Male guards and female guards too—for Title VII of the Civil Rights Act of 1964 opens prisons to women and requires states to hire them unless sex is a bona fide occupational qualification, a high standard of necessity. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *United States v. Gregory,* 818 F.2d 1114 (4th Cir.1987) (rejecting an argument that a desire to curtail cross-sex monitoring of naked prisoners makes sex a bona fide occupation qualification for prison guards); see also *United Auto Workers v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). Unless female guards are shuffled off to back office jobs, itself problematic under Title VII, they are bound to see the male prisoners in states of undress. Frequently. Deliberately. Otherwise they are not doing their jobs. *Smith v. Fairman,* 678 F.2d 52 (7th Cir. 1982), puts two and two together, holding that in light of Title VII female guards are entitled to participate in the normal activities of guarding, including pat-down searches of male inmates. We held in *Torres v. Wisconsin Department of Health & Social Services,* 859 F.2d 1523 (7th Cir.1988) (en banc), a case filed by guards under Title VII, that a state could exclude men from one of its four prisons, in order to promote the female prisoners' rehabilitation. *Torres* did not say that the Constitution requires this exclusion; instead we deferred to the judgment of prison administrators that they needed to limit cross-sex monitoring to achieve penological objectives. Today deference leads to the opposite result: Cook County does not believe that cross-sex monitoring imperils its

mission, and evenhanded willingness to accept prison administrators' decisions about debatable issues means that Johnson cannot prevail under the due process clause.

After holding in *Hudson* that prisoners lack any reasonable expectation of privacy under the fourth amendment, the Court remarked that a prisoner could use the eighth amendment to overcome "calculated harassment unrelated to prison needs." 468 U.S. at 530, 104 S.Ct. at 3202. Similarly, the Court observed in *Graham* that the eighth amendment offers some protection supplementary to the fourth. 490 U.S. at 392, 394, 109 S.Ct. at 1869, 1870. We therefore think it best to understand the references to "privacy" in *Canedy* and similar cases as invocations of the eighth amendment's ban on cruel and unusual punishments. See *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir.1993) (en banc), which makes explicit the role of that provision.

Johnson's complaint (and the brief filed on his behalf in this court by a top-notch law firm) do not allege either particular susceptibility or any design to inflict psychological injury. A prisoner could say that he is especially shy—perhaps required by his religion to remain dressed in the presence of the opposite sex—and that the guards, knowing this, tormented him by assigning women to watch the toilets and showers. So, too, a prisoner has a remedy for deliberate harassment, on account of sex, by guards of either sex. Johnson does not allege this or anything like it. His case therefore does not present the sort of claim that *Hudson* holds in reserve. It does not satisfy the more general requirements of the eighth amendment either.

■ One who makes a claim under the cruel and unusual punishments clause must show that the state has created risk or inflicted pain pointlessly. "After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (internal quotations omitted). See also *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Wilson v. Seiter,* 501 U.S. 294, 298–300, 111 S.Ct. 2321, 2323–2325, 115 L.Ed.2d 271 (1991); *Helling v. McKinney,* —— U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Does cross-sex monitoring serve a function beyond the infliction of pain? Monitoring is vital, but how about the cross-sex part? For this there are two justifications.

■ First, it makes good use of the staff. It is more expensive for a prison to have a group of guards dedicated to shower and toilet monitoring (equivalently, a group that can do every function *except* this) than to have guards all of whom can serve each role in the prison. If only men can monitor showers, then female guards are less useful to the prison; if female guards can't perform this task, the prison must have more guards on hand to cover for them. It is a form of featherbedding. *O'Lone* held that an interest in the efficient deployment of the staff permits the prison to block inmates from attending religious services, although religion has powerful protection in the first amendment. Similarly, an interest in efficient deployment of the staff supports cross-sex monitoring. See *Timm v. Gunter,* 917 F.2d 1093, 1102 (8th Cir.1990), which concludes that "opposite-sex surveillance of male inmates, performed on the same basis as same-sex surveillance," is constitutionally permissible. By the same token, the prison may assign homosexual male guards to monitor male prisoners, heterosexual male guards to monitor effeminate male homosexual prisoners, and so on. There are too many permutations to place guards and prisoners into multiple classes by sex, sexual orientation, and perhaps other criteria, allowing each group to be observed only by the corresponding groups that occasion the least unhappiness.

Second, cross-sex monitoring reduces the need for prisons to make sex a criterion of employment, and therefore reduces the potential for conflict with Title VII and the equal protection clause. Cells and showers are designed so that guards can see in, to prevent violence and other offenses. Prisoners dress, undress, and bathe under watchful eyes. Guards roaming the corridors are bound to see naked prisoners. A prison

could comply with the rule Johnson proposes, and still maintain surveillance, only by relegating women to the administrative wing, limiting their duties (thereby raising the cost of the guard complement), or eliminating them from the staff.

To the riposte that Title VII and the equal protection clause can't authorize a violation of the eighth amendment, we rejoin: True enough, but not pertinent. A warden must accommodate conflicting interests—the embarrassment of reticent prisoners, the entitlement of women to equal treatment in the workplace. A state may reject the prisoner's claim if it has a reason, as *Wolfish* establishes for a substantially greater intrusion. The interest of women in equal treatment is a solid reason, with more secure footing in American law than prisoners' modesty, leading to the conclusion that there is no violation of the eighth amendment. We held as much already in *Smith v. Fairman.* When interests clash, a judge must prefer those based on legislative decisions over those that reflect their own views of sound policy. The premise of judicial review is that the Constitution is an authoritative decision binding on all branches of government; when it has only such substance as judges pour into it themselves, the decisions of the elected branches prevail. *Canedy* accordingly avowed reluctance to do more than forbid cross-sex body searches, 16 F.3d at 187, which it conceived as pointless debasement. Anonymous visual inspections from afar are considerably less intrusive and carry less potential for "the unnecessary and wanton infliction of pain". To the extent incautious language in *Canedy* implies that deliberate visual inspections are indistinguishable from physical palpitations, its discussion is dictum. Further reflection leads us to conclude that it should not be converted to a holding.

How odd it would be to find in the eighth amendment a right not to be seen by the other sex. Physicians and nurses of one sex routinely examine the other. In exotic places such as California people regularly sit in saunas and hot tubs with unclothed strangers. Cf. *Miller v. South Bend,* 904 F.2d 1081 (7th Cir.1990) (en banc) (holding that there is a constitutional right to dance

nude in public), reversed under the name *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Most persons' aversion to public nudity pales compared with the taboo against detailed inspections of body cavities, yet the Court found no constitutional obstacle to these in *Wolfish;* the Constitution does not require prison managers to respect the social conventions of free society. Drug testing is common, although this often requires observation of urination. *Vernonia School District 47J v. Acton,* —— U.S. ——, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (drug testing of seventh grade boy as condition of participation in sports is "reasonable" under the fourth amendment); see also *Dimeo v. Griffin,* 943 F.2d 679, 682–83 (7th Cir.1991) (en banc), in which this court treated the imposition on privacy as slight. More to the point, the clash between modesty and equal employment opportunities has been played out in sports. Women reporters routinely enter locker rooms after games. How could an imposition that male athletes tolerate be deemed cruel and unusual punishment?

Some cases say that the Constitution forbids deliberate cross-sex monitoring (as opposed to infrequent or accidental sightings). See *Cornwell v. Dahlberg,* 963 F.2d 912, 916–17 (6th Cir.1992) (basing this conclusion on the fourth amendment, but without mentioning *Hudson* ); *Lee v. Downs,* 641 F.2d 1117, 1120 (4th Cir.1981) (decided three years before *Hudson* ). Decisions such as *Timm* and *Grummett v. Rushen,* 779 F.2d 491 (9th Cir. 1985), which hold that cross-sex monitoring is constitutional, could be treated as fact-bound, although some of their language is unqualified (we have quoted such a passage from *Timm* ). Each emphasized that the female guards' views were not universally unobstructed. But if this is important (and we do not think it is), Johnson's own complaint brings the case within the scope of *Timm.* Johnson alleges that

> when a female correctional officer is assigned to work a dorm it is her duty and responsibility to make counts, also to constantly supervise all inmates in the dorms, making periodic, unannounced spot checks of inmates in their living area, and s[u]rveying in the remainder of the area such

as the general toilet, and shower facilities, which is in an open unobstructed area, except by a thin sheet that can be seen through.

Thus Johnson tells us that the Jail offers some, but imperfect, shielding from guards' observation, exactly the situation that the eighth circuit held permissible in *Timm*. We agree with that conclusion. See also *Jordan v. Gardner*, 986 F.2d at 1545–67 (Wallace, Wiggins, Trott & Kleinfeld, JJ., dissenting).

Any practice allowed under the due process analysis of *Turner* is acceptable under the eighth amendment too—not only because the objective component of cruel and unusual punishment is more tolerant toward wardens, but also because the eighth amendment has a demanding mental-state component. *Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), holds that the standard is criminal recklessness. The guard or warden must want to injure the prisoner or must know of and disregard a substantial risk that harm will befall the prisoner. Johnson does not allege that any of the defendants sought to humiliate him. Although he filed the complaint pro se, his lawyer did not add this allegation to the brief and showed no inclination to advance it when pressed at oral argument. Of course, we must grant Johnson the benefit of all allegations in the complaint and everything he might prove consistent with that document. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir.1992). The district court assumed that the cross-sex viewing was inadvertent, an inappropriate step when evaluating a complaint under Rule 12(b)(6). But what Johnson wants to show is not that the defendants adopted their policy to cause injury, but that they ignored his sensibilities. He must believe it sufficient to show that they acted deliberately.

Put the eighth amendment aside for a moment and consider the question whether a "deliberate" decision—that is, a considered choice with knowledge of the consequences— establishes "intent" for purposes of constitutional provisions containing a mental-state ingredient. That question has been before the Supreme Court many times, and the answer is "no." A good example is *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), apropos because it deals with sex discrimination. Massachusetts decided to give military veterans an absolute, lifetime preference in employment. Approximately 98% of veterans are male, and as a result the bureaucracy is overwhelmingly male. A three-judge district court held the preference unconstitutional. Recognizing that the equal protection clause forbids only disparate treatment, and not disparate impact, see *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the district court observed that people are deemed to intend the natural and probable consequences of their acts. Massachusetts adopted the preference deliberately, and it maintained the preference after recognizing that it excluded many qualified women from the civil service. The Supreme Court acknowledged all of this but held that deliberate acts, with knowledge of the consequences, do not establish "intent" in the constitutional sense—for, if they did, then the distinction between disparate treatment and disparate impact would collapse as soon as anyone informed the decisionmaker of the impact. After a canvass of its cases, the Court concluded:

> "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

442 U.S. at 279, 99 S.Ct. at 2296 (citation and footnotes omitted). Since *Feeney* the distinction between choices made "because" the decisionmaker wants to achieve particular consequences, and those "in spite of" unwelcome effects, has been a staple of constitutional law. See, e.g., *Miller v. Johnson*, —— U.S. ——, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995).

Wardens make many choices that have unpleasant consequences for prisoners, and frequently wardens wish that they could do things differently. Budgetary shortfalls may dictate that prisoners live in cramped condi-

tions, even though wardens know that penological purposes would be better served by additional space. The question whether a deliberate choice to put two prisoners in a cell with only 100 square feet of space satisfied the intent component of the eighth amendment came up in *Wilson v. Seiter.* Prisoners alleged that the dilapidated facility had "overcrowding, excessive noise, insufficient locker storage space, inadequate heating and cooling, improper ventilation, unclean and inadequate restrooms, unsanitary dining facilities and food preparation, and housing [of regular inmates] with mentally and physically ill inmates." 501 U.S. at 296, 111 S.Ct. at 2322. The warden knew all about this, and official decisions led to the problems— for example, the state spent money on guards' salaries rather than better food facilities. The Court assumed that conditions at the prison fell below objectively permissible standards but held that the prisoners had not demonstrated the essential mental state.

To put this differently, the question in *Wilson* was whether the mental-state requirement applies to systemic conditions, which affect all prisoners. The Court answered yes, acknowledging that this could perpetuate some unwelcome conditions:

> The United States suggests that a state-of-mind inquiry might allow officials to interpose the defense that, despite good-faith efforts to obtain funding, fiscal constraints beyond their control prevent the elimination of inhumane conditions. Even if that were so, it is hard to understand how it could control the meaning of "cruel and unusual punishment" in the Eighth Amendment. An intent requirement is either implicit in the word "punishment" or is not; it cannot be alternately required and ignored as policy conditions might dictate.

501 U.S. at 301–02, 111 S.Ct. at 2325–26. "If the pain inflicted is not formally meted out *as punishment* by the statute or sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Id.* at 300, 111 S.Ct. at 2325 (emphasis in original). No intent to injure means no "punishment"; and no "punishment," no violation.

Let us test this with an illustration. Suppose the warden decides to issue guns to the guards, a step that in the absence of an ongoing riot violates contemporary norms because weapons create risks. Prisoners may seize them and shoot the guards or each other; guards may discharge them accidentally, injuring the prisoners. The decision to issue the guns is deliberate, and everyone knows that some injuries will follow. The warden hopes that a reduction in violence within the prison will compensate for the new risk. Can a prisoner obtain an injunction excluding guns from the prison on the ground that the risk exceeds the anticipated benefits? Or suppose the inevitable happens: a guard shoots a prisoner. Has the warden violated the eighth amendment? The answer from *Whitley* is "no," because the warden did not want harm to come to the prisoners and adopted the policy in an attempt to reduce violence. The policy was not designed to punish anyone and therefore, under *Whitley, Wilson,* and *Farmer,* does not violate the eighth amendment. A warden displays "deliberate indifference" only if he *ignores* the costs to prisoners, excluding them from the calculus of costs and benefits, or if he allows guns into the prison because he wants prisoners to suffer. An incorrect assessment of recognized costs and benefits is just negligence, which does not violate the fifth amendment (even if "gross," see *Archie v. Racine,* 847 F.2d 1211, 1218–20 (7th Cir. 1988) (en banc)), and does not violate the eighth amendment either. Cf. *Collins v. Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (public policies that create risks for employees do not violate the Constitution, even if the risks are taken knowingly); *Walker v. Rowe,* 791 F.2d 507 (7th Cir.1986) (same principle, applied to risks that lead to death of prison guards). Yet this gun policy is deliberate in the same sense as the policy permitting cross-sex monitoring, and injury is as predictable as the existence of embarrassed inmates.

Where does this leave us? The fourth amendment does not protect privacy interests within prisons. Moving to other amendments does not change the outcome. Cross-sex monitoring is not a senseless imposition.

As a reconciliation of conflicting entitlements and desires, it satisfies the *Turner* standard. It cannot be called "inhumane" and therefore does not fall below the floor set by the objective component of the eighth amendment. And Johnson does not contend that his captors adopted their monitoring patterns because of, rather than in spite of, the embarrassment it causes some prisoners. He does not submit that the warden ignored his sensibilities; he argues only that they received too little weight in the felicific calculus. Like the district court, therefore, we conclude that the complaint fails to state a claim on which relief may be granted.

AFFIRMED.

POSNER, Chief Judge, concurring and dissenting.

I agree with the district judge and my colleagues that Johnson's equal protection claim has no possible merit, that there is no possible basis for imputing liability to the president of the Cook County Board of Commissioners, and that the claims against the defendants in their official capacities must be dismissed as unauthorized suits against the State of Illinois. That is where my agreement ends.

The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution, like so much in the Bill of Rights, is a Rorschach test. What the judge sees in it is the reflection of his or her own values, values shaped by personal experience and temperament as well as by historical reflection, public opinion, and other sources of moral judgment. No other theory of constitutional interpretation can explain the elaborate edifice of death-penalty jurisprudence that the Supreme Court has erected in the name of the Eighth Amendment. Or the interpretation of the amendment as a charter, however limited, of the rights of prisoners. The limitations imposed by the amendment might be thought, indeed were thought for more than 150 years after the amendment was adopted, to end with the sentence, leaving the management of prisons, the informal "punishment" meted out by brutal guards, constitutionally unregulated.

The critical values, in giving content to the Eighth Amendment, are those of the Justices of the Supreme Court. My colleagues believe that the Justices have spoken to the issue presented by this case. I think that they have not, and I shall try to show this. But I want first to lay out the essential background of facts and values on which I believe the judgment in this case must ultimately turn.

There are different ways to look upon the inmates of prisons and jails in the United States in 1995. One way is to look upon them as members of a different species, indeed as a type of vermin, devoid of human dignity and entitled to no respect; and then no issue concerning the degrading or brutalizing treatment of prisoners would arise. In particular there would be no inhibitions about using prisoners as the subject of experiments, including social experiments such as the experiment of seeing whether the sexes can be made interchangeable. The parading of naked male inmates in front of female guards, or of naked female inmates in front of male guards, would be no more problematic than "cross-sex surveillance" in a kennel.

I do not myself consider the 1.5 million inmates of American prisons and jails in that light. This is a non-negligible fraction of the American population. And it is only the current inmate population. The fraction of the total population that has spent time in a prison or jail is larger, although I do not know how large. A substantial number of these prison and jail inmates, including the plaintiff in this case, have not been convicted of a crime. They are merely charged with crime, and awaiting trial. Some of them may actually be innocent. Of the guilty, many are guilty of sumptuary offenses, or of other victimless crimes uncannily similar to lawful activity (gambling offenses are an example), or of esoteric financial and regulatory offenses (such as violation of the migratory game laws) some of which do not even require a guilty intent. It is wrong to break even foolish laws, or wise laws that should carry only civil penalties. It is wrongful to break the law even when the lawbreaker is flawed, weak, retarded, unstable, ignorant,

brutalized, or profoundly disadvantaged, rather than violent, vicious, or evil to the core. But we should have a realistic conception of the composition of the prison and jail population before deciding that they are a scum entitled to nothing better than what a vengeful populace and a resource-starved penal system choose to give them. We must not exaggerate the distance between "us," the lawful ones, the respectable ones, and the prison and jail population; for such exaggeration will make it too easy for us to deny that population the rudiments of humane consideration.

The nudity taboo retains great strength in the United States. It should not be confused with prudery. It is a taboo against being seen in the nude by strangers, not by one's intimates. Ours is a morally diverse populace and the nudity taboo is not of uniform strength across it. It is strongest among professing Christians, because of the historical antipathy of the Church to nudity; and as it happens the plaintiff alleges that his right "to practice Ch[r]istian modesty is being violated." The taboo is particularly strong when the stranger belongs to the opposite sex. There are radical feminists who regard "sex" as a social construction and the very concept of "the opposite sex," implying as it does the dichotomization of the "sexes" (the "genders," as we are being taught to say), as a sign of patriarchy. For these feminists the surveillance of naked male prisoners by female guards and naked female prisoners by male guards are way stations on the road to sexual equality. If prisoners have no rights, the reconceptualization of the prison as a site of progressive social engineering should give us no qualms. Animals have no right to wear clothing. Why prisoners, if they are no better than animals? There is no answer, if the premise is accepted. But it should be rejected, and if it is rejected, and the duty of a society that would like to think of itself as civilized to treat its prisoners humanely therefore acknowledged, then I think that the interest of a prisoner in being free from unnecessary cross-sex surveillance has priority over the unisex-bathroom movement and requires us to reverse the judgment of the district court throwing out this lawsuit.

I have been painting in broad strokes, and it is time to consider the particulars of this case and the state of the precedents. Albert Johnson, a pretrial detainee in the Cook County Jail, complains that female guards were allowed to watch his naked body while he showered and used the toilet. All we have is the complaint, which my colleagues want to dismiss without giving Johnson a chance to develop the facts. The main issue raised by the appeal is whether a prisoner has an interest that the Constitution protects in hiding his naked body from guards of the opposite sex. A subordinate issue is whether, if so, the complaint—which Johnson drafted without assistance of counsel—sufficiently alleges deliberate as distinct from merely accidental exposure to survive dismissal.

The parties have confused the first issue by describing it as the extent of a prisoner's "right of privacy." They cannot be criticized too harshly for this. Countless cases, including our own *Canedy v. Boardman,* 16 F.3d 183 (7th Cir.1994), have done the same thing. E.g., *Cornwell v. Dahlberg,* 963 F.2d 912, 916–17 (6th Cir.1992); *Cookish v. Powell,* 945 F.2d 441, 446 (1st Cir.1991) (per curiam); *Cumbey v. Meachum,* 684 F.2d 712 (10th Cir.1982) (per curiam). The problem is that the term "right of privacy" bears meanings in law that are remote from its primary ordinary-language meaning, which happens to be the meaning that a suit of this sort invokes. One thing it means in law is the right to reproductive autonomy; another is a congeries of tort rights only one of which relates to the naked body; still another is the right to maintain the confidentiality of certain documents and conversations. Another and overlapping meaning is the set of interests protected by the Fourth Amendment, which prohibits unreasonable searches and seizures. That amendment has been held to be inapplicable to searches and seizures within prisons, *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984), and if applicable to jails housing pretrial detainees as distinct from convicted defendants—an unsettled question—is only tenuously so, *Bell v. Wolfish,* 441 U.S. 520, 556–57, 99 S.Ct. 1861, 1883–84, 60 L.Ed.2d 447 (1979); *Brothers v. Klevenhagen,* 28 F.3d 452, 457 and n. 6 (5th Cir.1994); *Valencia v.*

*Wiggins,* 981 F.2d 1440 (5th Cir.1993); *United States v. Willoughby,* 860 F.2d 15, 21 (2d Cir.1988), though this may depend on the precise invasion complained of. A unanimous Supreme Court held in *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), that forcing a pretrial detainee to undergo surgery violates the Fourth Amendment. Cf. *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989); *Hammer v. Gross,* 932 F.2d 842, 845 n. 1 (9th Cir.1991) (en banc).

One part of the tort right of privacy is the right to prevent the publicizing of intimate facts, including the sight of the naked body. *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1229–30 (7th Cir.1993). Even this right is not the basis of Johnson's suit. This is not a common law tort suit, and anyway the sight of his naked body was not "publicized" in the sense that this term bears in the law of torts. *United States v. Dorfman,* 690 F.2d 1230, 1234 (7th Cir.1982); *Beverly v. Reinert,* 239 Ill.App.3d 91, 179 Ill.Dec. 789, 794, 606 N.E.2d 621, 626 (1992); *Restatement (Second) of Torts,* § 652D, comment a (1977).

*Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), while holding that a statute which required keeping a record of the names of people for whom physicians prescribed certain dangerous though lawful drugs did *not* invade any constitutional right of privacy, can be read to imply that the disclosure by or under the compulsion of the government of a person's medical records might invade a constitutional right of privacy, presumably a "substantive due process" right. "Disclosure" of the person's naked body might be argued to violate a cognate right to the concealment of the body. In this way a right to "privacy" in the rather literal sense in which it is invoked here might laboriously be extracted from constitutional precedent.

I consider this too tortuous and uncertain a route to follow in the quest for constitutional limitations on the infliction of humiliation on prison inmates. The Eighth Amendment forbids the federal government (and by an interpretation of the due process clause of the Fourteenth Amendment the states as well) to inflict cruel and unusual punishments. The due process clause has been interpreted to lay a similar prohibition on the infliction of cruel and unusual punishments on pretrial detainees who, like Johnson, not having been convicted, are not formally being "punished." *Bell v. Wolfish, supra,* 441 U.S. at 534–35, 99 S.Ct. at 1871–72; *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). I take it that purely psychological punishments can sometimes be deemed cruel and unusual. *Thomas v. Farley,* 31 F.3d 557, 559 (7th Cir.1994); *Williams v. Boles,* 841 F.2d 181, 183 (7th Cir.1988); *Northington v. Jackson,* 973 F.2d 1518, 1523 (10th Cir.1992); *Jordan v. Gardner,* 986 F.2d 1521, 1530–31 (9th Cir.1993) (en banc); cf. *McDonald v. Haskins,* 966 F.2d 292 (7th Cir.1992); but see *Wisniewski v. Kennard,* 901 F.2d 1276 (5th Cir.1990) (per curiam). The question is then whether exposing naked prisoners to guards of the opposite sex can ever be deemed one of these cruel and unusual psychological punishments. The Sixth Circuit held in *Kent v. Johnson,* 821 F.2d 1220, 1227 (6th Cir.1987), that it can be, and did not retract the holding in its order on rehearing, although it did retract any suggestion that cross-sex surveillance was unconstitutional per se. See *Id.* at 1229. My colleagues do not suggest that recasting Johnson's right of privacy claim as a claim under the Eighth Amendment can prejudice the state. The substance of the analysis is unchanged, and the parties in their briefs cite Eighth Amendment cases interchangeably with right of privacy cases.

I have no patience with the suggestion that Title VII of the Civil Right Act of 1964 forbids a prison or jail to impede, however slightly, the career opportunities of female guards by shielding naked male prisoners from their eyes. It is true that since the male prison population is vastly greater than the female, female guards would gain no corresponding advantage from being allowed to monopolize the surveillance of naked female prisoners. But Title VII cannot override the Constitution. There cannot be a right to inflict cruel and unusual punishments in order to secure a merely statutory entitlement to equal opportunities for women in the

field of corrections. Although the equal protection clause of the Fourteenth Amendment has been held to protect women against sex discrimination by a state, *Trigg v. Fort Wayne Community Schools,* 766 F.2d 299, 302 (7th Cir.1985); *Gray v. Lacke,* 885 F.2d 399, 414 (7th Cir.1989); *Day v. Wayne County Board of Auditors,* 749 F.2d 1199, 1205 (6th Cir.1984), and the Cook County jail is an arm of the State of Illinois, the clause is not plausibly interpreted to license the infliction of cruel and unusual punishments. Just as it would not be a defense to a charge that the rack and thumbscrew are forms of cruel and unusual punishment to demonstrate that they are cheaper than imprisonment, so it is not a defense to the infliction of cruel and unusual psychological punishments that they advance women's career opportunities. And this is assuming that the interests of women would be advanced by a rule, implicit in my colleagues' decision, that gave no legal protection to female prisoners from the prying eyes of male guards; for Title VII and the equal protection clause are considered to protect men as well as women from sex discrimination.

This is not to say that exposing the naked male body to women's eyes constitutes cruel and unusual punishment in *all* circumstances. A male prisoner has no constitutional right to be treated by a male doctor. Cf. *Dothard v. Rawlinson,* 433 U.S. 321, 346 n. 5, 97 S.Ct. 2720, 2735 n. 5, 53 L.Ed.2d 786 (1977) (separate opinion); *Gargiul v. Tompkins,* 704 F.2d 661 (2d Cir.1983), vacated on other grounds, 465 U.S. 1016, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984). Men have long been attended in hospitals by female nurses, and latterly by female doctors as well. Even the "right of privacy" cases reject the suggestion that any time a female guard glimpses a naked male prisoner his rights have been invaded. See, e.g., *Michenfelder v. Sumner,* 860 F.2d 328, 335 (9th Cir.1988); *Grummett v. Rushen,* 779 F.2d 491, 494–95 (9th Cir.1985). Not only is the injury from an occasional glimpse slight; but in addition, as we can see when the "right of privacy" cases are reclassified under the proper constitutional rubrics, neither the Eighth Amendment nor the counterpart protections of pretrial detainees under the due process clauses extend to unintentional

wrongs. *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991); *Murphy v. Walker,* 51 F.3d 714, 719 (7th Cir.1995) (per curiam); *Ivey v. Harney,* 47 F.3d 181, 182 (7th Cir.1995); *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985). Deliberately to place male prisoners under continuous visual surveillance by female guards, however, so that whenever the prisoner dresses or undresses, takes a shower, or uses the toilet, a woman is watching him, gives even my colleagues pause.

Ours is the intermediate case, where the prison or jail makes no effort, or a patently inadequate effort, to shield the male prisoners from the gaze of female guards when the prisoners are nude. No case holds that the surveillance of naked inmates by guards of the opposite case is lawful per se—not *Timm v. Gunter,* 917 F.2d 1093, 1101–02 (8th Cir. 1990), and not *Hudson v. Palmer, supra,* which held only that the right of privacy protected by the Fourth Amendment does not extend to prisoners, and not, as I shall show, *Bell v. Wolfish.* I infer from their discussion of *Torres v. Wisconsin Dept. of Health & Social Services,* 859 F.2d 1523 (7th Cir.1988) (en banc), that my colleagues believe that female inmates have no constitutionally protected interest in not being seen in the nude by male guards. This surprises me. *Jordan v. Gardner, supra,* is against this view, and no case supports it.

I have stated the interest at issue in this case as not being seen nude by a guard of the opposite sex, not only because most people are more embarrassed in that situation but also because the right of prisons and jails to maintain visual surveillance of potentially dangerous prisoners even when naked cannot be doubted in light of the serious security problems in many American prisons and jails today. What is in question is the right of prison officials to entrust the surveillance of naked prisoners to guards of the opposite sex from the prisoners. *Bell v. Wolfish, supra,* holds that pretrial detainees may be subjected to digital and visual inspection of the rectum for concealed weapons or other contraband. It does not follow that no constitu-

tional issue is raised if the search is performed by a male guard on a female prisoner, or a female guard on a male prisoner; or if the search is visual rather than digital (it was both in *Bell v. Wolfish* ); or if what is being watched is the prisoner's genitalia rather than the interior of his rectum. *Jordan v. Gardner, supra,* 986 F.2d at 1522, holds that "a policy that requires male guards to conduct random, non-emergency, suspicionless clothed body searches on female prisoners," violates the Eighth Amendment. What Johnson alleges is worse, albeit with the sexes reversed.

The Eighth Amendment requires in my view that reasonable efforts be made to prevent frequent, deliberate, gratuitous exposure of nude prisoners of one sex to guards of the other sex. I doubt that any more precise statement of the proper constitutional test is feasible. It is precise enough to show that my colleagues indulge in hyperbole when they say that a decision for Johnson would mean that "female guards are shuffled off to back office jobs." They would not be, but that is not the most important point. The most important point is that sexual equality may not be pursued with no regard to competing interests, and with an eye blind to reality. The reality is that crime is gendered, and the gender is male. Stephen J. Schulhofer, "The Feminist Challenge in Criminal Law," 143 *University of Pennsylvania Law Review* 2151 (1995). The vast majority of criminals are male. The vast majority of their victims are male. The vast majority of police and correctional officers are male. These are inescapable realities in the design of penal institutions and the validation of penal practices.

My colleagues toy with the idea that unless the *intentions* of the prison officials are in some sense punitive, there can be no liability under the cruel and unusual punishments clause, whatever the psychological impact of the prison's actions. There is support for this suggestion in language of some lower-court cases quoted in *Wilson v. Seiter, supra,* 501 U.S. at 300, 111 S.Ct. at 2325. But I do not think that that language was intended to override the distinction between motive and intent. The cruel and unusual punishments

clause is not limited to sadistic inflictions, or, as my colleagues put it, to cases in which "the state has created risk or inflicted pain *pointlessly* " (my emphasis). The motives of prison officials and guards are in fact irrelevant. The relevant deliberateness is the deliberate adoption of a measure that constitutes cruel and unusual punishment. If prison officials use the thumbscrew and rack to discipline unruly prisoners, it is immaterial that their motive is not to punish but merely to maintain good order in the prison, or to save money. *Id.* at 301–02, 111 S.Ct. at 2325–26. The public beheadings of murderers by Saudi Arabia are, I imagine, motivated not by sadism but rather (to the extent that they have any secular motivation) by a belief that the public infliction of cruel punishments minimizes the crime rate. If prison officials deliberately expose male prisoners to the gaze of female guards, or female prisoners to the gaze of male guards, it should be irrelevant that the motive of the officials may have been merely to avoid sorting custodial tasks by gender.

The distinction between motive and intent runs all through the law. If someone plants a bomb in an airplane, his intent in the eyes of the law is to kill, though his motive might be to intimidate political opponents, obtain publicity, demonstrate skill with explosives, collect life insurance on a passenger, or distract the police from his other criminal activities. *United States v. McAnally,* 666 F.2d 1116, 1119 (7th Cir.1981). More to the point, the distinction that I am emphasizing between motive and intent is implicit in the standard of "deliberate indifference" which the courts use to determine whether the state of mind required by the Eighth Amendment is present. See, e.g., *Wilson v. Seiter, supra,* 501 U.S. at 303, 111 S.Ct. at 2326; *Ivey v. Harney, supra,* 47 F.3d at 182. That standard is satisfied by proof of "actual knowledge of impending harm easily preventable," *Duckworth v. Franzen, supra,* 780 F.2d at 653—a formulation that dispenses entirely with any investigation of motive. If prison officials know that they are subjecting male prisoners to gratuitous humiliation, the infliction is deliberate, even if the officials are not actuated by any punitive purpose and are not even certain that humiliation will result. "[A]n eighth amendment complainant need

not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan, supra,* —— U.S. at ——, 114 S.Ct. at 1981. The principal application of the standard of deliberate indifference is to cases of medical care. If prison officials, knowing that an inmate is seriously ill, refuse to provide him with any treatment, the fact that their motive is not to punish him but merely to save time and money is not a defense to his Eighth Amendment claim. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); see also *Wilson v. Seiter, supra,* 501 U.S. at 302, 111 S.Ct. at 2326.

I turn now to the question whether the complaint states a claim for the infringement of the right that I have sketched. The defendants appeal to the principle repeated in a number of recent cases that although the Federal Rules of Civil Procedure require only a short and plain statement of the plaintiff's claim, a plaintiff who decides to write a prolix complaint risks pleading himself out of court by alleging facts (which bind him as judicial admissions) that negate an element of his claim. E.g., *Warzon v. Drew,* 60 F.3d 1234, 1239–40 (7th Cir.1995); *Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir.1995). The defendants fasten on the allegation in the complaint that there was a "sheet" between the bathroom (containing both showers and toilets) used by Johnson and other male inmates and the area in which the guards are stationed. In fact what Johnson alleged was that

> when a female correctional officer is assigned to work a dorm it is her duty and responsibility to make counts, also to constantly supervise all inmates in the dorms, making periodic, unannounced spot checks of inmates in their living area, and s[u]rveying in the remainder of the area such as the general toilet, and shower facilities, which is in an open unobstructed area, except by a thin sheet that can be seen through.

This can fairly be read to allege that female guards assigned to Johnson's dorm are responsible for maintaining visual surveillance of the bathroom, which they are able to do because it is separated from the part of the dorm in which the guards are stationed by a transparent "sheet," perhaps a kind of shower curtain. So read, the complaint is consistent with a form of cross-sex surveillance sufficiently frequent, gratuitous, and deliberate to withstand dismissal on the pleadings. A further factual inquiry is necessary to determine whether Johnson's constitutional rights have been violated.

My colleagues say that we must respect "the hard choices made by prison administrators." I agree. There is no basis in the record, however, for supposing that such a choice was made here, or for believing that an effort to limit cross-sex surveillance would involve an inefficient use of staff—"featherbedding," as my colleagues put it. There is no record. The case was dismissed on the complaint. We do not know whether the Cook County Jail cannot afford a thicker sheet or, more to the point, cannot feasibly confine the surveillance of naked male prisoners to male guards and naked female prisoners to female guards. We do not even know what crime Johnson is charged with. My colleagues urge deference to prison administrators, but at the same time speak confidently about the costs of redeploying staff to protect Johnson's rights. It would be nice to know a little more about the facts before making a judgment that condones barbarism.