**Jane PECKHAM, Plaintiff–Appellant,**

v.

**WISCONSIN DEPARTMENT OF COR-RECTIONS, Patrick J. Fiedler, Terri Landwehr, Kristine Krenke, and Bradley Gehring, Defendants–Appellees.**

No. 96–1894.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1997.

Decided April 1, 1998.

Michael B. Nash (argued), Chicago, IL, for Plaintiff–Appellant.

Richard A. Victor (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees except Gehring.

Peter M. Farb (argued), Gabert, Williams & Farb, Appleton, WI, for Defendant–Appellee Gehring.

Before CUDAHY, EASTERBROOK, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Here we have yet another case about prison strip searches. This one began when Jane Peckham filed a *pro se* complaint alleging that Wisconsin prison and jail officials subjected her to around 35 strip searches (we use the term "strip search" to refer to a visual inspection of a naked inmate without intrusion into the person's body cavities). Claiming the searches were unconstitutional, she sought a ban on them in the future, along with a $1,000 fine against each defendant, and a $1,000 damage award to her for each search already performed. The district court, Magistrate Judge Aaron E. Goodstein sitting with the consent of the parties, dismissed the suit on the defendants' motion for summary judgment. Peckham, now with an attorney at her side, appeals.

Our case concerns events at the Taycheedah Correctional Institution and the Outagamie (Wisconsin) County Jail, which contracted with the State of Wisconsin to hold prisoners in order to alleviate overcrowding at state prisons. Peckham, who is serving time for a variety of offenses and has been in both facilities, sued the Wisconsin Department of Corrections and its chief administrative officers, along with the sheriff who oversees the county jail.

■ Guards at the Outagamie jail regularly conduct strip searches of prisoners in four situations: whenever a prisoner first arrives at the jail from another facility, whenever a prisoner returns to the jail from a visit with a doctor or from court, whenever a prisoner finishes a contact visit with a nonprisoner, and whenever prison officials undertake a general search of a cell block. Officers of the Wisconsin Department of Corrections, under the Wisconsin Administrative Code, conduct strip searches under similar circumstances and also whenever a prisoner moves into segregation or when time is tacked onto a prisoner's term in segregation (this addition-al time is known, in Corrections' lingo, as "adjustment time"). None of the searches about which Peckham complains occurred outside these general policy guidelines.

Peckham points out that many of the strip searches she endured occurred even though she never left the sight of her guard escorts and even though she often continuously wore handcuffs and leg irons. She explains that guards often searched her even though she did not have physical contact with other inmates or outsiders. Peckham notes that her "adjustment time" searches at Taycheedah took place even though she never left the segregation unit. In her only allegation regarding a specific search, Peckham says she was strip-searched (by a female guard) on one occasion when a male guard "was in the area."

According to Peckham, the strip searches caused psychological injury, increased tensions, and deterred her and other inmates from pursuing things like medical attention. When describing the damage caused by the searches, Peckham argues on behalf of all inmates, not just herself. She produced "expert" affidavits attesting to the deleterious effects of strip searches and to their ineffectiveness at detecting the presence of contraband, which is their main objective. In her complaint she made no claim that specific searches violated particular rights; instead, she broadly alleged that the "strip searches constitute[d] a general infringement of the constitutional rights of plaintiff."

The defendants advanced several reasons why they were entitled to summary judgment: (1) the court must accord deference to prison officials in matters of prison security, (2) prison officials do not need probable cause to conduct strip searches, and (3) the strip search policies at Taycheedah and the jail are needed to prevent the entry of contraband into the facilities.

Judge Goodstein viewed Peckham's suit as an attack on the security and orderly operation of prisons. He characterized the complaint as "challenging the practices and policies relating to the use of strip searches." Examining the case under *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447

(1979), the leading Supreme Court case on strip searches,[1] the judge concluded:

> In each type of instance cited by plaintiff, considering the deferential treatment which prison officials are entitled to in matters affecting the security of the institutions they run, the legitimate interests of plaintiff in avoiding a strip search are outweighed by the needs of prison authorities to such an extent that no reasonable factfinder could find in plaintiff's favor.

Judge Goodstein cited a number of cases to demonstrate that the officers at the Taycheedah and Outagamie facilities have sound reasons for conducting strip searches. The judge noted *Bruscino v. Carlson*, 854 F.2d 162 (7th Cir.1988), in which we described the efficacy of strip searches in reducing violent incidents. In a crucial portion of his decision Judge Goodstein relied upon *Del Raine v. Williford*, 32 F.3d 1024 (7th Cir.1994), and its copious citations to cases in which various courts have upheld strip searches of inmates on punitive status, strip searches of prisoners in administrative segregation, and strip searches of inmates who leave for or return from libraries and infirmaries. Judge Goodstein ultimately concluded that since courts have upheld strip searches of each hue challenged in the complaint, Peckham did not have a case.

Peckham's appeal presents an unspecified generalized claim that the strip searches in this case were unconstitutional. The magistrate judge's approach to the case, as urged by the parties, focused on the question of reasonableness—an indication that the case was considered under the Fourth Amendment. But if it is a Fourth Amendment case we are surprised the parties failed to cite, here or in the district court, the Supreme Court's decision in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), or our decisions in *Canedy v. Boardman*, 16 F.3d 183 (7th Cir.1994), and *Johnson v. Phelan*, 69 F.3d 144 (7th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996). These cases, it seems to

us, have more relevance to Ms. Peckham's claims than do the cases noted in the briefs of the parties.

In *Hudson* an inmate's cell was searched during a general "shakedown" at a Virginia correctional institution. The Court of Appeals for the Fourth Circuit had held that a prisoner had a "limited privacy right" in his cell, but the Supreme Court reversed, holding:

> Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

468 U.S. at 525–26, 104 S.Ct. at 3199.

In *Canedy* we considered a prison strip search involving a male inmate who was strip-searched twice by female guards. We interpreted *Hudson*, noting:

> Some diminution of privacy is of course to be expected in prison. *See Hudson v. Palmer* (prisoners are entitled to no reasonable expectation of privacy in their prison cells insuring them of Fourth Amendment protection against unreasonable searches and seizures). Inmates surely do not enjoy the full sweep of constitutional rights afforded other members of society. But even so, those who are convicted of criminal offenses do not surrender all of their constitutional rights.

16 F.3d at 185 (citation omitted).

*Canedy*, then, interpreted *Hudson's* abrogation of Fourth Amendment protections against unreasonable searches to apply to prisoners' cells, not to prisoners themselves. And then came *Johnson*. *Johnson*, one

---

1. *Bell v. Wolfish* involved strip searches of a prisoner in pretrial detention rather than a prisoner serving time after conviction. Thus, Peckham may have benefitted from the Court's more protective treatment of those presumed innocent as compared to the Court's more strict treatment of certain constitutional claims by convicted prisoners.

could argue, understood *Hudson* to leave inmates without *any* protection under the Fourth Amendment. But *Johnson* did not overturn *Canedy*. Instead, *Johnson* reframed *Canedy's* references to privacy as invocations of the Eighth, not the Fourth, Amendment. *Johnson* said:

> *Wolfish* assumed without deciding that prisoners retain some right of privacy under the fourth amendment. Five years later the Court held that they do not. *Hudson v. Palmer* observes that privacy is the thing most surely extinguished by a judgment committing someone to prison. . . .
>
> . . . .
>
> We therefore think it best to understand the references to "privacy" in *Canedy* and similar cases as invocations of the eighth amendment's ban on cruel and unusual punishments.

69 F.3d at 146–47.

 So, does a prison inmate enjoy any protection at all under the Fourth Amendment against unreasonable searches and seizures? Although we acknowledge the tension between *Johnson* and *Canedy*, we think the answer is "yes," [2] but we hasten to add that given the considerable deference prison officials enjoy to run their institutions it is difficult to conjure up too many real-life scenarios where prison strip searches of inmates could be said to be unreasonable under the Fourth Amendment. In that regard, we agree with Judge Goodstein that the searches, including those for medical visits about which Peckham complains, were not unreasonable. More importantly, regardless of how one views the Fourth Amendment in this context, it is the Eighth Amendment that is more properly posed to protect inmates from unconstitutional strip searches, notably when their aim is punishment, not legitimate institutional concerns. So how does Peckham's case stack up under the Eighth Amendment? Unfortunately for her, not too well. There is nothing alleged here which could lead a fact finder to conclude

that any of the searches were for harassment purposes or any purposes that could reasonably be said to be punishment. The searches were for legitimate, identifiable purposes, and given the deference we accord to prison authorities to run their institutions, there is no way the Eighth Amendment, on these facts, could come to Peckham's defense.

Finally, Peckham's case was, and is today, dismissable as to all individual defendants because none of them personally participated in any of the searches. But we have not relied on this point so Peckham, who filed her complaint *pro se*, will not lose her case on a pleading technicality. If this were merely a correctable pleading error we could send the case back to the district court with directions to let Peckham file an amended complaint naming the guards who actually searched her. But because no legal gymnastics here could rescue her case, we have not taken this easy way out.

AFFIRMED.

EASTERBROOK, Circuit Judge, concurring in the judgment.

Like *Johnson v. Phelan*, 69 F.3d 144 (7th Cir.1995), this case arises because a prisoner objects to visual inspections by guards. As in *Johnson*, the objection is based on the fourth amendment (applied to the states by the fourteenth). *Johnson* provides a short and sufficient reply, 69 F.3d at 147: "prisoners lack any reasonable expectation of privacy under the fourth amendment". We explained:

> [*Bell v.*] *Wolfish*[, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ], assumed without deciding that prisoners retain some right of privacy under the fourth amendment. Five years later the Court held that they do not. *Hudson v. Palmer*, 468 U.S. 517, 526–30 (1984), observes that privacy is the thing most surely extinguished by a judgment committing someone to prison. Guards take control of where and how prisoners live; they do not retain any right of seclusion or secrecy

---

**2.** By holding that prisoners retain some rights under the Fourth Amendment we join the 2nd, 6th, 9th and 11th circuits. *See Somers v. Thurman,* 109 F.3d 614, 618–19 (9th Cir.1997) (collecting cases and observing, after discussing *Johnson,* that "the Seventh Circuit stands alone in its peremptory declaration that prisoners do not retain a right to bodily privacy").

against their captors, who are entitled to watch and regulate every detail of daily life. After *Wolfish* and *Hudson* monitoring of naked prisoners is not only permissible—wardens are entitled to take precautions against drugs and weapons (which can be passed through the alimentary canal or hidden in the rectal cavity and collected from a toilet bowl)—but also sometimes mandatory. Inter-prisoner violence is endemic, so constant vigilance without regard to the state of the prisoners' dress is essential. Vigilance over showers, vigilance over cells—vigilance everywhere, which means that guards gaze upon naked inmates.

*Id.* at 146. *Johnson* holds that the eighth rather than the fourth amendment supplies the framework by which to analyze claims that guards needlessly or maliciously examine prisoners' bodies. Yet in this case, three years later, the plaintiff neither asks us to reexamine *Johnson* nor makes a claim under the eighth amendment.

Instead of rejecting plaintiff's claim with a citation to *Johnson*, my colleagues gainsay that case. They write: "does a prison inmate enjoy any protection at all under the Fourth Amendment against unreasonable searches and seizures? ... [W]e think the answer is 'yes,' but we hasten to add that given the considerable deference prison officials enjoy to run their institutions it is difficult to conjure up too many real-life scenarios where prison strip searches of inmates could be said to be unreasonable under the Fourth Amendment." 141 F.3d at 697 (footnote omitted). This passage is unnecessary, unreasoned, and self-contradictory.

The passage is unnecessary because the majority goes on to say that nothing the prison did violated Peckham's rights "regardless of how one views the Fourth Amendment in this context" (141 F.3d at 697). The lack of need to contradict *Johnson* renders the passage *dictum.*

The passage is unreasoned because the majority does not say *why* the answer is "yes." This court is always willing to reexamine its precedents in the light of new arguments, but my colleagues present none.

Neither did the parties, who ignored *Johnson,* so the majority's assertion is uninformed by an adversarial presentation. Nor is *Johnson* in tension with decisions of a superior tribunal. Never has the Supreme Court held or even intimated that persons convicted of crime retain any privacy rights against their captors. Lists of the rights that survive imprisonment, see *Hudson,* 468 U.S. at 523–24, 104 S.Ct. at 3198–99, and *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974), conspicuously omit privacy, and for good reason. Rights of seclusion and secrecy vanish at the jailhouse door.

A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that "[l]oss of freedom of choice and privacy are inherent incidents of confinement."

*Hudson,* 468 U.S. at 527–28, 104 S.Ct. at 3201 (footnote and citation omitted; brackets in original). This is why *Hudson* and *Johnson* held that objections to visual inspections had to be analyzed under the cruel and unusual punishments clause of the eighth amendment. This is a topic on which the majority and dissent in *Johnson* were in accord; the judges disagreed about how the eighth amendment affects monitoring by guards of the opposite sex but agreed on the irrelevance of the fourth amendment.

Finally, the passage is self-contradictory because it asserts both that prison searches are governed by the fourth amendment and that prison officials retain "considerable deference" to determine the scope of searches. (My colleagues must mean "discretion" rather than "deference", but the idea is clear.) Yet standards under the fourth amendment are objective, fixed by the judiciary without deference to law enforcement personnel. See, e.g., *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996);

*Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A principal reason why both *Hudson* and *Johnson* held that claims of this kind must be analyzed under the eighth amendment is that the cruel and unusual punishments clause builds in deference to prison administrators through a combination of objective and subjective elements. See also *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). If the only way to use the fourth amendment in strip-search cases is to make it functionally identical to the cruel and unusual punishments clause, then what's the point? Far better to leave the fourth amendment out of the analysis and avoid watering down the role of courts in specifying objective standards.

Maybe my colleagues have been led to include this unfortunate passage because they think it evident that the fourth amendment governs throughout the United States. That's undeniable, so of course the fourth amendment "applies" inside the nation's prisons. *Sparks v. Stutler,* 71 F.3d 259 (7th Cir.1995), so holds when concluding that the fourth amendment interest in bodily integrity recognized by *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)—which means that surgical invasions of a person's body in search of evidence must be objectively reasonable—does not vanish with conviction and imprisonment. What *Hudson* and *Johnson* hold is that convicts lack any reasonable expectation of privacy that may be asserted against their custodians and that searches of cells and other places where contraband may be hidden, including the space under one's clothing, need not be justified by any particular quantum of suspicion. That principle should not be impugned.